UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MAGALI GALLEGOS, individually, and on behalf of other members of the general public similarly situated,<br><br>        Plaintiff,<br><br>        v.<br><br>COMERICA BANK, a Texas Corporation; COMERICA INCORPORATED, a Delaware Corporation; and COMERICA MANAGEMENT COMPANY, INC., a Michigan Corporation; and Does 1 through 100, inclusive,<br><br>        Defendants. | CASE NO. CV 11-01938 MMM (PLAx)<br><br>ORDER GRANTING PLAINTIFF'S MOTION FOR REMAND |

On February 18, 2011, Magali Gallegos filed this putative wage and hour class action in Los Angeles Superior Court against Comerica Bank, Comerica Incorporated, and Comerica Management Company, Inc. (collectively, "Comerica").[1] On March 7, 2011, defendants removed

---

[1]Defendants' Notice of Removal ("Removal"), Docket No. 1 (March 7, 2011), Exh. A ("Complaint").

the action to federal court, invoking the court's diversity jurisdiction.[2] Gallegos has filed a motion to remand,[3] which defendants have opposed.[4]

# I. FACTUAL AND PROCEDURAL BACKGROUND

## A. Complaint's Allegations

Gallegos was employed by defendants as an Assistant Banking Center Manager ("ABCM") from approximately September 2006 until approximately December 2010 at a Comerica banking center in Burbank, California.[5] Gallegos was classified as an "'exempt' employee, and paid [ ] on a salary basis, without any compensation for overtime hours worked, missed meal periods or rest breaks."[6]

The complaint alleges that defendants own and operate approximately one-hundred Comerica banking centers in California.[7] The banking centers are allegedly "grouped into the following four distinct geographic districts: 'South Coast;' 'Greater Los Angeles;' 'San Francisco Bay Area;' and 'Northern California.' Each district has its own Regional Manager who is responsible for the operation of the banking centers in that district."[8] Gallegos seeks to represent a class of "[a]ll current and former California-based salaried 'Assistant Banking Center Managers' or persons who held similar job titles and/or performed similar job duties, who worked at a Comerica Banking Center located within Defendant's 'Greater Los Angeles District' at any time

---

[2]Removal, ¶ 1.

[3]Motion to Remand ("Motion"), Docket No. 10 (April 6, 2011); see also Reply in Support of Motion to Remand ("Reply"), Docket No. 21 (June 3, 2011).

[4]Opposition to Motion to Remand ("Opposition"), Docket No. 14 (May 27, 2011).

[5]Complaint, ¶ 26.

[6]*Id.*, ¶ 27.

[7]*Id.*, ¶ 13.

[8]*Id.*

2

during the period from November 3, 2005 to final judgment."[9]  All of the "Comerica Banking Centers that fall under [Comerica's] 'Greater Los Angeles District' are located within the County of Los Angeles."[10]  Although Gallegos asserts that the "membership of the entire class is unknown to [her] at this time," she estimates that the class has approximately sixty members.[11]

Gallegos alleges that defendants "willfully, knowingly, and intentionally failed" to compensate her and other class members as required by California law.[12]  She also asserts that defendants "engaged in a uniform policy and systematic scheme of wage abuse against their 'Assistant Banking Center Managers'" which involved "misclassifying the[ ] position[s] as 'exempt' for purposes of the payment of overtime compensation. . . ."[13]  Gallegos contends that defendants "knew or should have known that Plaintiff and the other class members were entitled to receive . . . they were not receiving. . . ,"[14] and that defendants "regularly and consistently" failed to pay overtime wages despite the fact that she "and . . . other class members were required to work more than eight (8) hours per day and/or forty (40) hours per week. . . ."[15]

Gallegos also alleges that defendants "knew or should have known that [she] and . . . other class members were entitled to receive all" meal and rest "periods or payment of one additional hour of pay at [their] regular rate of pay when a" meal or rest "period was missed," and that class members "regularly and consistently" did not receive meal and rest periods or payment as required by the Industrial Welfare Commission Wage Orders.[16]  Gallegos does not specifically

---

[9]*Id.*, ¶ 21 (emphasis added).

[10]*Id.*, ¶ 13.

[11]*Id.*, ¶ 23.

[12]*Id.*, ¶ 45.

[13]*Id.*, ¶ 35.

[14]*Id.*, ¶ 36.

[15]*Id.*, ¶ 46.

[16]*Id.*, ¶¶ 37-39, 47.

3

allege how frequently she and other class members were denied the opportunity to take meal or rest periods.

Finally, Gallegos asserts that the wage statements class members received during their employment were not accurate,[17] and that defendants failed to pay all wages owed when class members finished their employment.[18]  She does not specify how many class members left defendants' employ during the class period or how many were not paid wages due on termination.

Based on theses allegations, Gallegos asserts the following state law claims on her behalf and on behalf of the class: (1) failure to pay overtime wages in violation of California Labor Code §§ 510 and 1198 and (2) violations of California Business and Professions Code § 17200, *et seq.*, including (a) failure to provide meal periods in violation of California Labor Code §§ 226.7 and 512(a); (b) failure to provide rest periods in violation of California Labor Code § 226.7; (c) failure to pay class members minimum wages in violation of California Labor Code §§ 1194, 1197, and 1197.1; (d) failure to timely pay wages upon termination in violation of California Labor Code §§ 201 and 202; (e) failure to timely pay wages during employment in violation of California Labor Code § 204; (f) failure to furnish accurate time records to class members in violation of California Labor Code § 226(a); (g) failure to keep complete and accurate payroll records in violation of California Labor Code § 1174(d); and (h) failure to reimburse necessary business-related expenses and costs in violation of California Labor Code §§ 2800 and 2802.[19]

Gallegos' prayer for relief seeks (1) class members' unpaid overtime wages; (2) pre-judgment interest on any unpaid minimum wages and overtime compensation from and after the date such amounts were due; (3) statutory wage penalties under California Labor Code § 1197.1; (4) liquidated damages pursuant to California Labor Code § 1194.2; (5) reasonable attorneys' fees and costs of suit pursuant to California Labor Code § 1194(a); (6) civil penalties under California Labor Code §§ 2699(a), (f), and (g), plus costs and attorneys' fees for violation of California

---

[17]*Id.*, ¶¶ 40, 43.

[18]*Id.*, ¶ 41.

[19]*Id.*, ¶¶ 55-82.

Labor Code §§ 510, 1194, 1197, 1197.1, and 1198; (7) restitution of unpaid wages and other money wrongfully withheld from her and other class members, as well as prejudgment interest; (8) the appointment of a receiver to receive, manage, and distribute funds acquired by defendants as a result of their purported violations of California Business & Professions Code § 17200, *et seq*; and (9) reasonable attorneys' fees and costs under California Code of Civil Procedure § 1021.5.[20] While Gallegos alleges that her individual damages total less that $75,000,[21] she does not specify the total amount sought on behalf of the class.

## B. Notice of Removal

On March 7, 2011, defendants answered Gallegos' complaint and removed the action to federal court, invoking the court's diversity jurisdiction under 28 U.S.C. § 1332(a).[22] Defendants contend there is complete diversity of citizenship between them and Gallegos, and that the amount in controversy exceeds $75,000.[23]

In support of removal, defendants proffered the declaration of Catherine Moye, senior vice president in charge of administrative management for Comerica Management Company ("CMC").[24] Moye states that Comerica International is a Delaware corporation with its principal

---

[20]*Id.* at 17-19.

[21]*Id.*, ¶ 1.

[22]Removal, Exh. B ("Answer"); Removal, ¶ 1.

[23]*Id.*, ¶¶ 12–70.

[24]Moye Decl., ¶ 1. Moye represents that although Comerica Bank and Comerica Incorporated are the parent companies of CMC, she has access to information regarding the employees and operations of these companies as well. (*Id.*, ¶ 3). Plaintiff objects to Moye's declaration on the grounds that she has "failed to establish foundation for several statements made in her declaration, and also failed to submit documents which would have supported her statements." (Motion at 2.) Moye represents, however, that the information in her declaration is known to her because of her position at CMC and her review of the company's reports, payroll records, and operations. (Moye Decl., ¶¶ 1–3). The court concludes that the testimony is based on personal knowledge and overrules Gallegos' foundation objection. See *Mora v. Harley-Davidson Credit Corp.*, No. 1:08-cv-01453 OWW GSA, 2009 WL 464465, *4 n. 1 (E.D. Cal. Feb. 24, 2009) (overruling an objection to testimony by a corporate director of customer

5

place of business in Texas,[25] that Comerica Bank, a subsidiary of Comerica International, is a Texas banking association that has its principal place of business in Texas,[26] and that CMC, also a subsidiary of Comerica Bank, is incorporated and has its principal place of business in Michigan.[27]

Moye asserts that CMC employed Gallegos from September 6, 2006 to December 3, 2010 as an ABCM in California.[28] She represents that Gallegos was classified as "exempt" from overtime, "which meant, among other things, that she was not required to record her actual hours worked in the . . . time-keeping system utilized by Defendants, Ceridian." Moye also asserts that Gallegos was not required to record meal breaks if they were taken or record lack of meal or rest breaks that were not taken.[29] She states that from September 5, 2006 to April 3, 2008, Gallegos earned an annual salary of $50,000.08; that from April 4, 2008 to April 2, 2009, her annual salary was $51,500.08; that from April 3, 2009 to April 1, 2010, Gallegos was paid $52,401.18 annually; and that from April 2, 2010 to December 3, 2010, she earned $52,925.34 per year.[30] Moye states that Ceridian time records indicate that "(i) there were 177 workweeks during which . . . Gallegos worked 4 or more days; and (ii) there were 43 workweeks where [she] worked 3 or less days, or was on vacation or a leave of absence."[31] Moye represents that Gallegos "was paid every two weeks," and that company records "reflect that from February 18, 2010 through

solutions concerning customer credit figures where the testimony was based on a review of company records).

[25]Moye Decl., ¶ 4.

[26]*Id.*, ¶ 5.

[27]*Id.*, ¶ 6.

[28]*Id.*, ¶ 7.

[29]*Id.*, ¶¶ 7, 9.

[30]*Id.*, ¶ 8.

[31]*Id.*, ¶ 11.

the end of her employment with Defendants on December 3, 2010, there were 21 pay periods which included a week in which Plaintiff worked at least 4 days in the week."[32]

Defendants also proffer a declaration Gallegos submitted in *Yiadira Cordova v. Comerica Bank, Comerica Incorporated, and Comerica Management Company, Inc.*, Case. No. 09-08905 MMM (PLAx), in support of their notice of removal.[33] In the declaration, Gallegos stated that as an ABCM, "approximately 10% of [her] time was spent performing 'managerial' tasks (i.e.[,] tasks different than those performed by hourly workers)."[34] She asserted that Comerica "knew 'Assistant Managers' were spending the vast majority of their time performing the same work and tasks as hourly employees, [yet] . . . never conveyed to [her] that this [wa]s not what Comerica expected."[35] Gallegos reported that as an ABCM, she was "usually scheduled to work Monday through Friday from 8:15 a.m. to 5:30 p.m. . . ," but "was usually unable to leave work until 5:45 or 6:00 p.m. Monday through Thursday and 6:30 or 6:45 p.m. on Fridays."[36] She estimated that she worked, "on average, approximately seven to nine hours of overtime per week. . . ."[37] She also noted that she was "rarely ever able to take 30 consecutive minutes of off duty time for a meal break within the first five hours of [her] shift" and "[l]ikewise, . . . almost never able to

---

[32]*Id.*, ¶ 12, Exh. A ("Ceridian").

[33]Removal, Exh. C ("Gallegos Decl."). Gallegos objects to defendants' inclusion of her declaration from the *Cordova* action, asserting that it was "improperly submitted . . . [as it was] filed in a separate lawsuit in which Plaintiff was not a party." (Motion at 1.) Although Gallegos cites no case law suggesting that a party's sworn testimony in a prior action cannot be considered in determining whether a case is properly within the court's diversity jurisdiction, and although the court has found no such authority, it need not address this objection because, even if the court considers the declaration, defendants have failed to make a sufficient showing that the amount in controversy requirement is satisfied.

[34]Gallegos Decl., ¶¶ 3-4.

[35]*Id.*, ¶ 5.

[36]*Id.*, ¶ 6.

[37]*Id.*

take 10 consecutive minutes of off duty rest break time."[38]

## II. DISCUSSION

### A. Legal Standard Governing Amendments to Stated Basis for Assertion of Federal Jurisdiction

Defendants originally removed the case on the basis that it fell within the court's diversity jurisdiction.[39] In their opposition to Gallegos' motion to remand, however, defendants assert that the court has jurisdiction under the Class Action Fairness Act of 2005 ("CAFA").[40] Gallegos contends that because defendants did not invoke jurisdiction under CAFA in their original notice of removal, and did not assert CAFA in support of removal until more than thirty days after they had notice of removability, the court should ignore defendants' arguments regarding CAFA.[41]

28 U.S.C. § 1653 provides that "[d]efective allegations of jurisdiction may be amended, upon terms, in the trial or appellate courts." The Ninth Circuit has held, however, that "since removal must be effected by a defendant within 30 days after receiving a copy of the complaint (28 U.S.C. § 1446), the removal petition cannot be thereafter amended to add allegations of substance but solely to clarify 'defective' allegations of jurisdiction previously made." *Barrow Dev. Co. v. Fulton Ins. Co.*, 418 F.2d 316, 317 (9th Cir. 1969).

District courts in the Ninth Circuit have repeatedly interpreted *Darrow* to prevent removing defendants from amending a notice of removal to assert a new jurisdictional basis for removal after the thirty day window for removal has lapsed. See *Sullivan v. BNSF Ry. Co.* 447 F.Supp.2d 1092, 1099 (D. Ariz. 2006) ("Removal petitions cannot be amended after the 30 day period . . .

---

[38]*Id.*, ¶ 9.

[39]Removal at 2 ("This Notice is based upon the original jurisdiction of this court over the parties under 28 U.S.C. § 1332(a) and the existence of complete diversity of citizenship among the parties").

[40]Opp. at 7.

[41]Reply at 5.

8

'to add allegations of substance[,] but solely to clarify defective allegations of jurisdiction previously made.' Alleging new grounds for removal constitutes an allegation of substance[,]" citing *Barrow*); *id.* ("'It would be a substantial injustice to allow Defendants to remove a case on one ground and then, when faced with a serious challenge to that ground, attempt to justify removal on an entirely different, and untimely, ground[,]'" quoting *Hinojosa v. Perez*, 214 F.Supp.2d 703, 707 (S.D. Tex. 2002)); *id.* at 1099-1100 ("'Completely new grounds for removal jurisdiction may not be added' after the thirty-day period for seeking removal[,]" citing Charles A. Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE: JURISDICTION § 3733 (3d ed. 1998)); *Western Asbestos Settlement Trust v. Zurich-American Ins. Co.* No. C 04-5263, 2005 WL 2375170, *4 (N.D. Cal. Mar. 30, 2005) ("Petitions for removal may not be amended to add substantive allegations after the thirty day removal period has lapsed . . . . [B]ecause the thirty day period has lapsed . . . [and] the [defendants'] new grounds were not included in the petition for removal, the Court does not consider them[,]" citing *Barrow*). See also *Wang v. Asset Acceptance, LLC*, 680 F.Supp.2d 1122, 1125 (N.D. Cal. 2010) ("Allegations of substance include asserting a new basis for federal jurisdiction[,]" citing *Barrow* and *Hemphill v. Transfresh Corp.*, No. 98-0899, 1998 WL 320840, *4 (N.D. Cal. June 11, 1998)). Compare *Alexander v. FedEx Ground Package System, Inc.* No. C 05-0038, 2005 WL 701601, *3 (N.D. Cal. Mar. 25, 2005) (allowing amendment where "[t]he defendants' opposition to remand does not offer new grounds for removal, rather it only seeks to explain and clarify facts asserted in their removal notice").

Gallegos' state court complaint was filed on February 18, 2011. Defendants removed. invoking the court's diversity jurisdiction, on March 7, 2011. Defendants first asserted that removal was proper under CAFA on May 27, 2011, in their opposition to Gallegos' motion to remand. Since raising a new jurisdictional basis for removal after the thirty day removal period has expired is impermissible,[42] the court will not consider whether this case could have been

_____

[42]At the July 25, 2011 hearing, defense counsel cited *Williams v. Costco Wholesale Corp.*, 471 F.3d 975 (9th Cir. 2006), for the proposition that the court can retain jurisdiction on any basis apparent on the face of the complaint. There, plaintiff sued Costco in California state court, alleging violations of federal and state law. Costco removed the action to district court, relying

properly removed under CAFA.[43]

---

on federal question jurisdiction. After removal, plaintiff amended the complaint, deleting the only federal claim and adding new state law claims. He then filed a motion to remand. The district court remanded, despite the fact that it had diversity jurisdiction to hear the state law claims. The court held that Costco could not rely on diversity of citizenship because it had not filed a second removal notice within thirty days after plaintiff filed the amended complaint – i.e., the pleading that first made clear diversity jurisdiction existed. The Ninth Circuit began by noting that it had "long held that post-removal amendments to the pleadings cannot affect whether a case is removable, because the propriety of removal is determined solely on the basis of the pleadings filed in state court." *Id.* at 976. It continued: "It follows that a party that has properly removed a case need not amend its removal notice or file a new notice after an amended complaint changes the ground for federal jurisdiction. Because post-removal pleadings have no bearing on whether the removal was proper, there is nothing a defendant can or need do to perfect the removal." *Id.* The court concluded: "Once a case has been properly removed, the district court has jurisdiction over it on all grounds apparent from the complaint, not just those cited in the removal notice." *Id.* at 977.

*Costco* is distinguishable from this case because the court here has determined that defendants were not entitled to remove because diversity jurisdiction – the original basis asserted for removal – was lacking. Additionally, this is not a case in which *plaintiff*'s post-removal amendments have changed the basis for jurisdiction. Here, it is *defendants* who are attempting to "amend" their notice of removal to assert a new post-removal basis for jurisdiction after the original basis on which they asserted jurisdiction failed. Finally, as addressed below, the existence of CAFA jurisdiction is not clear on the face of Gallegos' complaint.

---

[43]Even were the court to consider defendants' untimely amendment of their notice of removal, it would find that CAFA jurisdiction is lacking. The existence of CAFA jurisdiction is not clear on the face of Gallegos' complaint as the class she alleges has fewer than one hundred members and she pleads an amount in controversy of less than $5,000,000. Indeed, defendants' sole basis for invoking CAFA jurisdiction is that the court should aggregate Gallegos' claims with those of ABCMs employed elsewhere in California, who have filed similar actions against Comerica. Defendants cite *Freeman v. Blue Ridge Paper Prods.*, 551 F.3d 405, 409 (6th Cir. 2008), which held that separate actions filed in state court relating to separate time periods could be aggregated to satisfy CAFA's amount in controversy requirement "where there [was] no colorable basis for dividing up the sought-for retrospective relief . . . other than to frustrate CAFA." See also *Proffitt v. Abbott Laboratories*, No. 2:08-CV-151, 2008 WL 4401367, *5 (E.D. Tenn. Sept. 23, 2008) (permitting removal under CAFA where there was no justification for dividing a claim arbitrarily into multiple lawsuits "other than to circumvent . . . federal court jurisdiction").

These cases are inapposite here, however, as Gallegos has identified a colorable basis for the filing of separate actions. She asserts that defendants' "California banking centers are divided into four distinct geographic regions: 'South Coast,' 'Greater Los Angeles,' 'San Francisco Bay Area,' and 'Northern California[,]'" each with its own Regional Manager. (Complaint, ¶ 13.)

10

## B.    Legal Standard Governing Removal Jurisdiction

The right to remove a case to federal court is entirely a creature of statute.  See, e.g., *Libhart v. Santa Monica Dairy Co.*, 592 F.2d 1062, 1064 (9th Cir. 1979) ("The removal jurisdiction of the federal courts is derived entirely from the statutory authorization of Congress" (citations omitted)).  The removal statute, 28 U.S.C. § 1441, allows defendants to remove when a case originally filed in state court presents a federal question or is between citizens of different states.  See 28 U.S.C. §§ 1441(a), (b).  Only those state court actions that could originally have been filed in federal court may be removed.  28 U.S.C. § 1441(a) ("Except as otherwise expressly provided by Act of Congress, any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant . . . to the district court of the United States for the district and division embracing the place where such action is pending. . ."); see also, e.g., *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987) ("Only state-court actions that originally could have been filed in federal court may be removed to federal court by defendant").

The Ninth Circuit "strictly construe[s] the removal statute[s] against removal jurisdiction." *Gaus v. Miles, Inc.*, 980 F.2d 564, 566 (9th Cir. 1992) (citing *Boggs v. Lewis*, 863 F.2d 662, 663 (9th Cir. 1988), and *Takeda v. Northwestern Nat'l Life Ins. Co.*, 765 F.2d 815, 818 (9th Cir. 1985)).  "Federal jurisdiction must be rejected if there is any doubt as to the right of removal in

_____

She alleges, as a result, that "class actions on behalf of the putative class would be better and more efficiently pursued by litigating separate cases based on the 'districts' created by Comerica," as "[e]ach of the[ ] districts was created by Defendants to be run by a Regional Manager, and Regional Managers exercise significant authority and independent discretion.  The extent to which Regional Managers exercise [their] discretion has an impact upon practices, protocols, and guidelines in their distinct regions, which in turn has significant relevance to the claims asserted on behalf of the four different putative classes."  (Reply at 7.)  Because the alleged regional differences in practices, protocols, and guidelines provide a "colorable basis for dividing" ABCMs' claims into four separate actions, the court concludes, based on the record presently before it, that forced aggregation under *Freeman* would be inappropriate.  In the event that a more fully developed record suggests the propriety of aggregation, defendants may raise the issue again at an appropriate time in the context of other actions pending before or to be transferred to this court.

the first instance." *Id.* (citing *Libhart v. Santa Monica Dairy Co.*, 592 F.2d 1062, 1064 (9th Cir. 1992)). "The 'strong presumption' against removal jurisdiction means that the defendant always has the burden of establishing that removal is proper." *Id.* (citing *Nishimoto v. Federman-Bachrach & Assocs.*, 903 F.2d 709, 712 n. 3 (9th Cir. 1990), and *Emrich v. Touche Ross & Co.*, 846 F.2d 1190, 1195 (9th Cir. 1988)).

Defendants contend that the court has diversity jurisdiction to hear this action is under 28 U.S.C. § 1332. "[J]urisdiction founded on [diversity] requires that parties be in complete diversity and [that] the amount in controversy exceed $75,000." *Matheson v. Progressive Specialty Ins. Co.*, 319 F.3d 1089, 1090 (9th Cir. 2003); see 28 U.S.C. § 1332(a)(1) ("The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens of different States. . .").

### 1. Complete Diversity

Complete diversity exists only where plaintiff's citizenship is different than that of each named defendant. 28 U.S.C. §§ 1332(a)(1), 1332(c)(1); see *Caterpillar, Inc. v. Lewis*, 519 U.S. 61, 68 n. 3 (1996); see also *Cook v. AVI Casino Enters., Inc.*, No. 07-15088, 2008 WL 4890167, *3 (9th Cir. Nov. 14, 2008) (Unpub. Disp.) ("We have jurisdiction only if Cook, a resident of California, has citizenship which is diverse from that of every defendant," citing *Lewis*, 519 U.S.

at 68).[44]  Plaintiff affirmatively alleges that she is a resident California.[45]  Defendants offer undisputed evidence that Comerica Incorporated is incorporated in Delaware, with its principal place of business in Texas; that Comerica Bank is a Texas banking association, with its principal place of business in Texas; and that Comerica Management Company is incorporated in Michigan, with its principal place of business in Michigan.[46]  As Gallegos implicitly acknowledges in her motion, defendants have met their burden of satisfying the complete diversity requirement.

## 2. Amount in Controversy

Although the burden of proving removal jurisdiction rests with defendants, the burden of proof they must satisfy differs depending on the nature of the damages allegations included in plaintiff's complaint.  "[W]hen the plaintiff fails to plead a specific amount of damages, . . . defendant[s] seeking removal 'must prove by a preponderance of the evidence that the amount in controversy requirement has been met.'"  *Lowdermilk v. United States Bank Nat'l Assoc.*, 479 F.3d 994, 998 (9th Cir. 2007) (quoting *Abrego v. The Dow Chemical Co.*, 443 F.3d 676, 683 (9th Cir. 2006)).  "[I]f the complaint alleges damages in excess of the federal amount-in-controversy requirement, [however,] then the amount-in-controversy requirement is presumptively satisfied unless 'it appears to a 'legal certainty' that the claim is actually for less than the jurisdictional minimum.'"  *Id.* (quoting *Abrego*, 443 at 683 n. 8).

---

[44]Complaint, ¶ 6.  Citizenship for diversity purposes is the place of one's domicile, not their residence.  *Kanter v. Warner-Lambert Co.*, 265 F.3d 853, 857 (9th Cir. 2001) ("The natural person's state citizenship is . . . determined by her state of domicile, not her state of residence.  A person's domicile is her permanent home, where she resides with the intention to remain or to which she intends to return. . . .  A person residing in a given state is not necessarily domiciled there, and thus is not necessarily a citizen of that State"); *Weible v. United States*, 244 F.2d 158, 163 (9th Cir. 1957) ("Residence is physical, whereas domicile is generally a compound of physical presence plus an intention to make a certain definite place one's permanent abode, though, to be sure, domicile often hangs on the slender thread of intent alone, as for instance where one is a wanderer over the earth.  Residence is not an immutable condition of domicile").  Because neither party asserts that Gallegos is not a California citizen, the court will assume that her residence and citizenship are the same.

[45]*Id.*; Removal, ¶ 13.

[46]Removal, ¶¶ 16-18.

13

The *Lowdermilk* court outlined this framework for two reasons. First, it noted that "federal courts . . . are courts of limited jurisdiction and . . . strictly construe [their] jurisdiction." *Id.* at 998 (citing *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)). Second, it noted the "well established [proposition] that the plaintiff is 'master of her complaint' and can plead to avoid federal jurisdiction." *Id.* at 999. Taking these principles together, the court concluded that "subject to a 'good faith' requirement in pleading, a plaintiff may sue for less than the amount she may be entitled to if she wishes to avoid federal jurisdiction and remain in state court." *Id.* (citing *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 288-89 (1938)).

Gallegos' complaint alleges that the amount in controversy for her claims, "including claims for compensatory damages, interest, and pro rata share of attorneys' fees, is less than $75,000."[47] Because the complaint specifies an amount of damages below $75,000, defendants must show "with legal certainty that [the] jurisdictional amount is met." See *Lowdermilk*, 479 F.3d at 998. The "legal certainty" standard sets a high bar and ensures that plaintiffs retain their power to limit recovery to avoid federal jurisdiction. See *id.* ("By adopting 'legal certainty' as the standard of proof, we guard the presumption against federal jurisdiction and preserve the plaintiff's prerogative, subject to the good faith requirement, to forgo a potentially larger recovery to remain in state court"). The court thus examines whether defendants have met the legal certainty standard.[48]

---

[47]Complaint, ¶ 1.

[48]At the hearing, defense counsel argued that the preponderance of the evidence standard applied. He cited *Sanchez v. Monumental Life Ins. Co.*, 102 F.3d 398, 404 (9th Cir. 1996), where the court held "that in cases where a plaintiff's state court complaint does not specify a particular amount of damages, the removing defendant bears the burden of establishing, by a preponderance of the evidence, that the amount in controversy exceeds" the jurisdictional minimum. *Sanchez* was decided more than ten years before *Lowdermilk*, and considered what was then a split of authority in which "some federal courts ha[d] . . . applied a variation of the 'legal certainty' test in removed cases where the . . . complaint [did] not specify a particular amount of damages." *Id.* at 402-03 (citing *Hale v. Billups of Gonzales, Inc.*, 610 F.Supp. 162, 163-64 (M.D. La. 1985) ("In determining whether the requisite jurisdictional amount is present, the Court must apply the 'legal certainty' test which was set forth [in *St. Paul Mercury* ]. When the jurisdictional amount is challenged, the party invoking the jurisdiction of the federal court *has the*

14

"In measuring the amount in controversy, a court must assume that the allegations of the complaint are true and that a jury will return a verdict for the plaintiff on all claims made in the complaint." *Korn v. Polo Ralph Lauren Corp.*, 536 F.Supp.2d 1199, 1205 (E.D. Cal. 2008) (citing *Kenneth Rothschild Trust v. Morgan Stanley Dean Witter*, 199 F.Supp.2d 993, 1001 (C.D.

_____

*burden of proving that it does NOT appear to a legal certainty that the claim is actually for less than the requisite jurisdictional amount.* Thus, in removal cases, it is incumbent upon the defendant to make the above showing" (emphasis original)). This split of authority no longer exists and there is no question that had Gallegos failed to allege an amount in controversy, the court would have applied the preponderance of the evidence standard. Unlike in *Sanchez*, however, Gallegos expressly alleged that the amount in controversy for her individual claim did not exceed $75,000. (See Complaint, ¶ 1 ("The amount in controversy for each class representative, including claims for compensatory damages, interest, and pro rata share of attorneys' fees, is less than $75,000.")). Although Gallegos placed this allegation at the beginning of her complaint, rather than in the prayer for damages, defendants cite no authority, and the court can find none, for the proposition that the location in the complaint of an allegation limiting the amount in controversy affects defendants' burden on removal.

*Guglielmino v. McKee Foods Corp.*, 506 F.3d 696 (9th Cir. 2007), also cited by defendants at oral argument, is not to the contrary. There, plaintiff alleged "that '[t]he damages to each Plaintiff are less than $75,000. In addition, the sum of such damages and the value of injunctive relief sought by plaintiff in this action is less than $75,000.' In its 'Prayer for Relief,' however, the complaint sought, among other things, damages under statutory and common law, punitive and exemplary damages (as to the fraud count), an accounting of other moneys due to plaintiffs, attorneys' fees, payments of back taxes and benefits, a declaration of the respective rights and obligations of the distributors and of McKee, an injunction prohibiting McKee's unfair business practices, and such other relief as the Court deemed proper." *Id.* at 687. The court held that because plaintiff alleged only that his "damages" were less than $75,000, but "fail[ed] to allege a sufficiently specific total amount in controversy," the preponderance of the evidence standard applied. *Guglielmino* is distinguishable because Gallegos has affirmatively alleged "[t]he amount in controversy for each class representative," and not merely the quantum of compensatory damages sought. Although Gallegos listed forms of relief in the prayer that were not mentioned in paragraph 1, the term "amount in controversy" is an all encompassing term. The fact that paragraph 2 stated that the amount in controversy "includ[ed]" certain forms of relief, and did not mention others later identified in the prayer, does not change this fact.

As courts have repeatedly noted, plaintiffs are "masters of their complaints," and "may limit their claims to avoid federal subject matter jurisdiction." See *Morgan v. Gay*, 471 F.3d 469, 474 (3d Cir. 2006) (citing *St. Paul Mercury*, 303 U.S. at 294 ("If [the plaintiff] does not desire to try his case in the federal court he may resort to the expedient of suing for less than the jurisdictional amount, and though he would be justly entitled to more, the defendant cannot remove.")). Here, Gallegos has affirmatively limited her recovery to less than $75,000. The court therefore concludes that the preponderance of the evidence standard does not apply.

15

Cal. 2002)).  "The ultimate inquiry is what amount is put 'in controversy' by the plaintiff's complaint, not what a defendant will *actually* owe."  *Id.* (emphasis original) (citing *Rippee v. Boston Market Corp.*, 408 F.Supp.2d 982, 986 (S.D. Cal. 2005) and *Scherer v. Equitable Life Assurance Society of the United States*, 347 F.3d 394, 399 (2d Cir. 2003)).

In their notice of removal, defendants contend that the amount in controversy is **$94,419.80**, based on Gallegos' claim that she is entitled to restitution for unpaid overtime wages, unpaid compensation for missed rest and meal breaks, penalties under California Labor Code §§ 1197.1 and 2699, and attorneys' fees.[49]  Defendants provide the following chart, which they assert represents "the total potential recovery" for Gallegos' claims:

| **Plaintiff's Claim** | **Amount in Controversy** |
|---|---|
| Restitution for Unpaid Overtime Wages | $52,451.52 |
| Restitution for Unpaid Compensation for Missed Rest Breaks | $13,117.33 |
| Restitution for Unpaid Compensation for Missed Meal Breaks | $13,117.33 |
| Labor Code § 1197.1 Penalties | $5,100.00 |
| Labor Code § 2699 Penalties | $2,050.00 |
| Attorneys' Fees | $8,583.62 |
| Amount in Controversy Subtotal | **$94,419.80** |

The court evaluates each entry in turn.

### (a)    Missed Rest Break Claim

Defendants contend that Gallegos' missed rest break claim could generate damages or restitution of $13,117.33.[50]  They argue that "applying [plaintiff's] under oath, sworn assertion [in] her declaration that she was 'almost never' able to take 10 consecutive minutes off for rest breaks, it is reasonable to [conclude] . . . that there were at least 3 days each week [that Gallegos]

---

[49]Removal, ¶ 68.

[50]*Id.*, ¶ 45.

worked at least 4 days in [the] week where she missed at least one rest break in a day."[51] Using this assumption, defendants calculate that the total number of rest periods Gallegos allegedly missed was 531.[52] Defendants proffer evidence of Gallegos' hourly wage at the time each rest break was purportedly missed, ranging from $24.94 per hour at the beginning of her tenure to $25.44 per hour at the end. Defendants apply these hourly rates to the number of days in which rest periods were allegedly missed, and conclude that the total amount potentially owed for missed rest periods is $13,117.33.

Gallegos does not appear to challenge defendants' report of the number of workweeks she worked four or more days, nor their representations regarding her hourly salary at various points during her employment. She does, however, challenge the fundamental assumption upon which defendants' calculation rests, i.e., that because she stated "she was 'almost never' able to take 10 consecutive minutes off for rest breaks, it is reasonable to [conclude] . . . that there were at least 3 days each week where . . . she missed at least one rest break in a day."[53]

As numerous courts in this circuit have found, mere "speculation or conjecture," *Lowdermilk*, 479 F.3d at 1002, or "too much extrapolation and speculation," *Ortiz v. Menu Foods, Inc.*, 525 F.Supp.2d 1220, 1224 (D. Haw. 2007), does not constitute proof to a legal certainty. See *Martinez v. Morgan Stanley & Co. Inc.*, No. 09-02937 L (JMA), 2010 WL 3123175, *6 (S.D. Cal. Aug. 9, 2010) (granting plaintiff's motion to remand where "[p]laintiff alleged that she 'frequently missed meal and rest periods' and that '[i]t was the environment at Morgan Stanley for Assistants to forego and work through [their] statutory right to rest breaks.' . . . Based on the foregoing, Defendants assume that assistants were not provided three rest or meal breaks per week. This assumption is unsupported by the allegations in the complaint or by evidence"); *Maddox v. Continental Cas. Co.*, No. CV 11-00967-RGK (PJWx), 2011 WL 641511,

---

[51]*Id.*, ¶ 41.

[52]177 workweeks in which Gallegos worked four days or more x 3 days per week with at least one missed rest period = 531 days with missed rest periods. (*Id.*)

[53]*Id.*, ¶ 41.

*1 (C.D. Cal. Feb. 10, 2011) (granting a motion to remand based on defendant's failure to prove the amount in controversy by a preponderance of the evidence where "[d]efendant calculates the amount in controversy by making significant assumptions. As to the first claim, Defendant assumes at least two missed meal periods and/or rest breaks per week. As to the second claim, Defendant assumes at least 10 hours of overtime per week. Based on these assumptions, Defendant has arrived at an amount in controversy equal to $75,260. [¶] Equally valid assumptions could be made that result in damages that are less than $75,000. Without any evidence supporting Defendant's assumptions, the Court finds Defendant's calculations unpersuasive. [¶] In short, Defendants ask the Court to speculate as to the number of overtime hours worked and the number of missed meal periods and rest breaks taken"); *Campbell v. Vitran Express, Inc.* No. CV-10-04442, 2010 WL 4971944, *3 (C.D. Cal. Aug. 16, 2010) (granting a motion to remand where plaintiffs alleged that "[d]efendant 'failed to provide the Plaintiffs . . . the required rest and meal periods during the relevant time period" and "Defendant improperly extrapolated these limited allegations, infusing each with extensive assumptions. . . [e.g., by] assum[ing], without any evidence, that [plaintiff] missed one meal period and one rest period five times per week," because "under the legal certainty standard, this type of calculation devoid of any concrete evidence 'is insufficient'" (citation omitted)); *Smith v. Brinker Int'l, Inc.*, No. C 10-0213 VRW, 2010 WL 1838726, *3 (N.D. Cal. May 5, 2010) ("Defendants' assumption that each plaintiff worked 2.5 hours overtime each day is not supported by the allegations in the operative complaint. . . . The complaint does not quantify the number of overtime hours that are allegedly subject to compensation, nor the number of meal and rest periods that defendants allegedly failed to provide. Defendants provide no sufficient basis to apply [an] assumption of 2.5 overtime hours each day [for purposes of] calculating the amount in controversy. The court may not base its jurisdiction on speculation and conjecture[,]" citing *Lowdermilk*, 479 F.3d at 1002); *Garcia v. Roadlink USA Pacific, LLC*, No. SACV 11-0445 DOC (AJWx), 2011 WL 2261273, *1-4 (C.D. Cal. June 7, 2011) ("Using a series of calculations, [defendants] estimate that the amount in controversy is actually over sixteen-million dollars. . . . Though their calculations

certainly suggest that it is possible that the amount in controversy is over five-million dollars, they have not come close to meeting the legal certainty standard" based on plaintiffs' allegations, *inter alia*, that "they worked . . . without being provided a minimum thirty minutes first and/or second meal period" and "without being permitted a minimum ten-minute rest period every four hours").

As in these cases, Comerica has assumed that Gallegos missed three rest breaks per week, which is supported neither by the allegations in the complaint nor by evidence.  Defendants rely solely on Gallegos' general statement that she "almost never" took rest breaks to support their assumption.  As a result, the court cannot conclude that defendants have met their burden of demonstrating *to a legal certainty* that their calculation reflects the amount recoverable for missed rest breaks.

### (b)  Missed Meal Break Claim

Defendants similarly contend that Gallegos' missed meal break claim could result in damages or restitution of $13,117.33.[54]  As was the case with the missed rest break claim, defendants assert that "applying [Gallegos'] under oath, sworn assertion [in] her declaration that it was 'extremely rare' that she was able to take a 30 minute meal period, it is reasonable to [conclude] . . . that there were at least 3 days each week [that] she worked at least 4 days in [the] week where she missed a 30 minute meal break in a day."[55]  Defendants therefore calculate that the total number of meal periods Gallegos allegedly missed was 531.[56]  Defendants apply the hourly rates described above to this number of days, and conclude that Gallegos can potentially recover $13,117.33 for missed meal periods.  As was true with her missed rest break claim, defendants' speculative extrapolation from Gallegos' statement that it was "extremely rare" for her to take meal breaks is insufficient to prove to a legal certainty that Gallegos was denied meal

---

[54]Removal, ¶ 54.

[55]*Id.*, ¶ 50.

[56]*Id.*

periods three times per week, or that the $13,117.33 figure for missed meal breaks is accurate.[57]

## (c) Unpaid Overtime Claims

Defendants next argue that since Gallegos states in her declaration she worked seven to nine overtime hours per week, it is "legally certain that she is claiming approximately eight (8) hours of overtime for all . . . weeks" she worked four or more days.[58] As defendants implicitly acknowledge, it is unreasonable to assume that Gallegos' testimony that she worked "approximately seven to nine hours of overtime per week" is true for every week she worked at Comerica. For example, defendants' records reveal 43 weeks in which Gallegos worked three or fewer days.[59] Gallegos does not appear to assert that she worked more than forty hours during such weeks, nor do defendants contend this is the case, notwithstanding the blanket statement in Gallegos' declaration that she worked "approximately seven to nine hours of overtime per

---

[57]Defendants' assumption that Gallegos would be able to recover for three missed meal periods *and* three missed rest breaks per week is also unsupported. California Labor Code § 226.7 states that "[i]f an employer fails to provide an employee a meal period or rest period . . . , the employer shall pay the employee one additional hour of pay at the employee's regular rate of compensation for each work day that the meal or rest period is not provided." Thus, an employee is entitled to an additional hour's wages per day, even if denied both a rest and meal period during that day. See *Lyon v. W. W. Grainger, Inc.*, No. C 10-00884 WHA, 2010 WL 1753194, *4 (N.D. Cal. Apr. 29, 2010) (holding that defendant's calculation of the amount in controversy on missed meal and rest break claims was too high because it assumed "recovery for each violation instead of one recovery per day"). While it is theoretically possible that Gallegos alternated, missing a meal period one day and a rest period the next, and never missed both on the same day, defendants have proffered no evidence that would permit the court to infer that this occurred nor to infer that she worked six days per week for each of the 177 weeks during which she worked four days or more. Defendants' assumption that Gallegos can recover for six days of missed meal/rest periods thus appears unreasonable. Rather, defendants' calculation of damages/restitution associated with Gallegos' meal and rest period claims essentially doubles the amount realistically recoverable under the statute. See *id.* (finding that defendant's estimate was "off by a magnitude of two").

[58]Removal, ¶ 31.

[59]Gallegos Decl., ¶ 6.

20

week."[60] Defendants proffer no evidence, moreover, suggesting that Gallegos' statement is true for all of the weeks she worked four days or more. Her declaration, in fact, suggests that during a week in which she worked four days (Monday through Thursday), she would have worked fewer than 7 to 9 hours of overtime for the week.[61] It appears, therefore, that Gallegos' declaration should be interpreted to mean that she worked 7-9 hours of overtime only during weeks in which she worked five or more days. It is unclear why defendants, who have full access to Gallegos' Ceridian records, and who have the burden of proffering "summary judgment-type evidence" to support removal, have failed to identify the number of weeks in which Gallegos worked five or six days. Even assuming *arguendo*, moreover, that defendants reasonably concluded that Gallegos worked eight hours of overtime per week, this results in only $52,451.52 of unpaid overtime

---

[60]Defendants, for example, use only the 43 weeks Cordova worked four or more days in their calculation of possible overtime due.

[61]During such a week, Gallegos would have worked fewer than 40 hours. While California's overtime statute requires the payment of overtime during any day a non-exempt employee works more than eight hours, see CAL. LAB. CODE § 510 ("Any work in excess of eight hours in one workday. . . shall be compensated at the rate of no less than one and one-half times the regular rate of pay for an employee"), Gallegos' declaration indicates that she would not be entitled to 7-9 hours of overtime compensation during a week she worked four days. If Gallegos in fact worked 8:15 a.m. to 6:00 p.m. each day, with a half-hour deducted for meal breaks, and 20 minutes deducted for rest breaks, see CAL. LAB. CODE § 512(a) ("An employer may not employ an employee for a work period of more than five (5) hours per day without providing the employee with a meal period of not less than 30 minutes, except that if the total work period per day of the employee is no more than six (6) hours, the meal period may be waived by mutual consent of the employer and the employee"); 8 CAL. CODE REG. § 11040 (every employer must permit employees to take authorized rest periods at the rate of 10 minutes (net) per four hours)), she would have worked only 3.6 hours of overtime in any four-day week (55 minutes per day). (The court does not include the time attributed to missed meal and rest breaks in this calculation, as Gallegos would be compensated for that time under Labor Code § 226.7. See CAL. LAB. CODE § 226.7 ("(a) No employer shall require any employee to work during any meal or rest period mandated by an applicable order of the Industrial Welfare Commission. (b) If an employer fails to provide an employee a meal period or rest period in accordance with an applicable order of the Industrial Welfare Commission, the employer shall pay the employee one additional hour of pay at the employee's regular rate of compensation for each work day that the meal or rest period is not provided")).

damages/restitution.[62]

**(d)      Penalties under Labor Code § 1197.1**

Gallegos seeks to recover penalties under California Labor Code § 1197.1(a).  That statute provides:

> "Any employer . . .who pays or causes to be paid to any employee a wage less than the minimum fixed by an order of the [labor] commission shall be subject to a civil penalty as follows: (1) For any initial violation that is intentionally committed, one hundred dollars ($100) for each underpaid employee for each pay period for which the employee is underpaid.  (2) For each subsequent violation for the same specific offense, two hundred fifty dollars ($250) for each underpaid employee for each pay period for which the employee is underpaid regardless of whether the initial violation is intentionally committed."

In calculating potential penalties of $5,100.00 under § 1197.1, defendants assume that Gallegos "is potentially entitled to Labor Code § 1197.1 penalties for each of the 21 pay periods within the statute of limitations."  They calculate a penalty of $100 for the initial pay period, plus $250 for each of the twenty subsequent pay periods, for a total of $5,100.00.  This calculation is premised on the assumption that defendants failed to pay Gallegos proper wages during every pay period she worked at least four or more days.  Once again, the evidence presented does not permit the court to draw such an inference.  Moreover, as noted below, even if the court were to assume that Gallegos could recover penalties for each of the 21 weeks, that would still be insufficient to demonstrate to a legal certainty that the amount in controversy exceeds $75,000.

**(e)      Penalties under Labor Code § 2699**

Gallegos also seeks to recover penalties under The Private Attorneys General Act of 2004 ("PAGA"), California Labor Code § 2699, for violations of § 510.  Labor Code § 558(a) provides, as a penalty for the violation of § 510, that

> "[a]ny employer or other person acting on behalf of an employer who violates, or

---

[62]Removal, ¶ 35.

22

causes to be violated, a section of this chapter or any provision regulating hours and days of work in any order of the Industrial Welfare Commission shall be subject to a civil penalty as follows: (1) For any initial violation, fifty dollars ($50) for each underpaid employee for each pay period for which the employee was underpaid in addition to an amount sufficient to recover underpaid wages. (2) For each subsequent violation, one hundred dollars ($100) for each underpaid employee for each pay period for which the employee was underpaid in addition to an amount sufficient to recover underpaid wages."[63]

Applying a penalty of $50 for the first pay period and $100 for the twenty subsequent pay periods within the statute of limitations, defendants calculate that the "potential Labor Code § 2699 penalties recoverable" are $2,050.00. This calculation assumes, however, that defendants failed to pay Gallegos proper wages during every pay period she worked at least four or more days. They adduce insufficient evidence to support the drawing of such an inference. Moreover, as discussed below, even if the court were to assume that Gallegos could recover penalties for each of the 21 weeks, that would still be insufficient to demonstrate to a legal certainty that the amount in controversy exceeds $75,000.

### (f)    Attorneys' Fees

Finally, Gallegos seeks to recover attorneys' fees under California Labor Code §1194(a).[64]

---

[63]Section 2699(f) sets forth penalties "[f]or all provisions of this code except those for which a civil penalty is specifically provided. . . ." Because § 558 provides a specific civil penalty for violations of § 510, defendants contend, and Gallegos does not dispute, that the specific penalty of § 558 applies here rather than the general penalty provision set forth in § 2699. See CAL. LAB. CODE § 558 ("Any employer or other person acting on behalf of an employer who violates, or causes to be violated, a section of this chapter or any provision regulating hours and days of work in any order of the Industrial Welfare Commission shall be subject to a civil penalty as follows. . .").

[64]See CAL. LAB. CODE § 1194(a) ("Notwithstanding any agreement to work for a lesser wage, any employee receiving less than the legal minimum wage or the legal overtime compensation applicable to the employee is entitled to recover in a civil action the unpaid balance of the full amount of this minimum wage or overtime compensation, including interest thereon, *reasonable attorney's fees, and costs of suit*" (emphasis added)).

Attorneys' fees are properly included in calculating the amount in controversy for purposes of diversity jurisdiction. See *Galt v. Scandinavia*, 142 F.3d 1150, 1156 (9th Cir. 1998) ("We hold that where an underlying statute authorizes an award of attorneys' fees, either with mandatory or discretionary language, such fees may be included in the amount in controversy"). See also *Lowdermilk*, 479 F.3d at 1000. Defendant contends that "[a]ssuming an extremely conservative attorneys' fee award of only 10% of the aforementioned amounts in controversy [for unpaid overtime, meal and rest break claims, and penalties], the amount of attorneys' fees recovered by Plaintiff should she prevail will likely exceed $8,583.62." As discussed, howver, the "aforementioned amounts in controversy" are based on a number of unfounded assumptions, which leads to an inflated fee award.

More fundamentally, however, courts are split as to whether a court can consider only the attorneys' fees that have accrued at the time of removal or whether it should take into account fees that can reasonably be anticipated over the life of the case. Compare *Brady v. Mercedes-Benz USA, Inc.*, 243 F.Supp.2d 1004, 1011 n. 4 (N.D. Cal. 2002) ("While an estimate of the amount in controversy must be made based on facts known at the time of removal, that does not imply that items such as future income loss, damages, or attorneys fees likely to be incurred cannot be estimated at the time of removal"); *Simmons v. PCR Tech.*, 209 F.Supp. 2d 1029, 1034-35 (N.D. Cal. 2002) ("Such fees necessarily accrue until the action is resolved. Thus, the Ninth Circuit must have anticipated that district courts would project fees beyond removal") with *Dukes v. Twin City Fire Ins. Co.*, No. CV-09-2197-PHX-NVW, 2010 WL 94109, *2 (D. Ariz. Jan. 6, 2010) ("This Court concludes that the better view is that attorneys' fees incurred after the date of removal are not properly included because the amount in controversy is to be determined as of the date of removal. Future attorneys' fees are entirely speculative, may be avoided, and are therefore not 'in controversy' at the time of removal"); *Faulkner v. Astro-Med, Inc.*, No. C 99-2562 SI, 1999 WL 820198, *4 (N.D. Cal. Oct. 4, 1999) ("When estimating attorney's fees for the purposes of establishing jurisdiction, the only fees that can be considered are those incurred as of the date of removal," citing *Miranti v. Lee*, 3 F.3d 925, 928 (5th Cir. 1993)); *Conrad*

*Associates v. Hartford Accident & Indemnity Co.*, 994 F.Supp. 1196, 1200 (N.D. Cal. 1998) (declining to consider post-removal events in calculating attorneys' fees for purposes of assessing removal); *Green v. Party City Corp.*, No. CV-01-09681 CAS (Ex), 2002 WL 553219, *2 & n. 3 (C.D. Cal. Apr. 9, 2002) (calculating attorneys' fees on the basis "only [of] work done by plaintiff's counsel prior to removal"). See also *Giordano v. Park Avenue Life Insurance Co.*, No. CV 09-01405 SJO (FMOx), 2009 WL 1474945, *3 (C.D. Cal. Apr. 7, 2009) ("Where attorneys' fees are to be included in the amount in controversy, 'district courts in this circuit have disagreed [as to] whether attorneys' fees incurred after the date of removal are properly included in the amount in controversy:' some courts refuse to consider attorneys' fees incurred after removal whereas others include a 'reasonable estimate of attorneys['] fees likely to be expended,'" quoting *Burk v. Medical Savings Insurance Co.*, 348 F.Supp.2d 1063, 1068-69 (D. Ariz. 2004) (alterations original)).

"Thus, [d]efendant['s] estimate of [p]laintiff['s] fees for activities anticipated but not yet performed, even if accurate, may be irrelevant. Further, even assuming that the correct approach is to include a reasonable estimate of fees likely to be recovered, [d]efendant['s] calculations are speculative, lack evidentiary support, and are conclusory at best." *Wastier v. Schwan's Consumer Brands*, No. 07CV1594, 2007 WL 4277552, *3 (S.D. Cal. Dec. 5, 2007). Given the Ninth Circuit's mandate that the removing party produce "summary-judgment-type evidence" showing that the amount in controversy requirement is met, *Valdez v. Allstate Ins. Co.*, 372 F.3d 1115, 1117 (9th Cir. 2004), the court concludes that defendants have not adduced adequate proof of the amount of attorneys' fees that should be used to calculate the amount in controversy. Therefore, the court declines to consider plaintiff's prayer for attorneys' fees in determining the amount in controversy.

### III. CONCLUSION

For the reasons stated, the court concludes that the "summary judgment-type" evidence defendants have proffered, including, in particular, Gallegos' declaration, is insufficient to meet their burden of proving to a legal certainty that the amount in controversy exceeds $75,000. Even assuming *arguendo* that defendants' calculation of Gallegos' damages on her overtime and penalties claims is correct, the amount in controversy would be only $59,602.00.[65] If the court were to add half the amount defendants suggest for the meal and rest break claims (since defendants doubled the amount recoverable by assuming that Gallegos could recover for one missed meal period *and* one missed rest period per day), the amount in controversy would still be only $66,160.00.[66] The court thus concludes that defendants have failed to prove to a legal certainty that it has subject matter jurisdiction to hear this action. Accordingly, it directs the clerk to remand the action to Los Angeles Superior Court forthwith.

DATED: July 27, 2011

_____
MARGARET M. MORROW
UNITED STATES DISTRICT JUDGE

---

[65]$52,451.52 (overtime wages) + $5,100.00 (§ 1197.1 penalties) + $2,050.00 (§ 2699 penalties) = $59,602.52.

[66]$52,451.52 (overtime wages) + $6,558.66 (meal and rest wages) + $5,100.00 (§ 1197.1 penalties) + $2,050.00 (§ 2699 penalties) = $66,160.18.

26